I would like to address this for a minute, minute and a half. I received the issue of recusal. It was out of the office this last week. I received this weekend the fax that came into my office from the U.S. Attorney's Office, the fax letter that was filed. Fax I received a courtesy call from the U.S. Attorney's Office on Friday. And in looking at this weekend, I've not filed anything myself this morning. In looking at 28 U.S.C. 455A, this is a self-enforcing part of the statute. There's no procedure there. What concerns, I've not spoken to my client, Mr. Fox. The concern is that count 34, the obstruction of justice, the basis for the obstruction was a violation of Your Honor's order. And we are challenged to that on appeal. Now, we're challenged You're not challenging the order, though. That's correct. No. Right. And we're not challenging it on the basis of insufficient evidence either. Right. We're challenging it on the basis of statute of limitations. Right. That's the one concern. And then the other concern was that on the first argument we make in the opening brief, the sufficient evidence on the two conspiracies, that's a de novo review. So we have, Your Honor, you know, in the SEC case Well, I Yeah. It's a summary You know, basically saying But the summary judgment was based upon there was no real opposition to the summary judgment. Right. Right. No, I understand. So that would be the only, and certainly there's no, we understand, and you have a reputation, Your Honor, for being utterly there. Let me just No, no. Yes, Your Honor. Let me just say that the facts in the civil case are not considered by us because they were, people took the Fifth Amendment, they were stipulated facts, and in a criminal case we just start over. It's what was shown in the trial of the criminal case. Absolutely. Absolutely. So the only, there is, though, a U.S. Supreme Court decision saying that 455A also goes to the appearance, and that would be the only issue, is whether there's, and you're I don't want to say, I've thought about this, and, you know, I just would just say this, that had I been on the district court, I could have handled this on a related case basis. Mr. Fox would move for your recusal just on the basis that I've stated. May I please to the court? It's not often that you can win at the court of appeal level on a submission of the evidence argument, and I realize that. If you look at the two conspiracy, you know, I'm addressing the two conspiracy counts that were found against my client, Mr. Fox, and step back for a second, because if you just think, you know, this was a 2098 trial, jeez, there must have been evidence that he did this. I mean, there just, it must have been presented, that it just had to have been. But you look, I mean, you step back, you realize that the jury acquitted Mr. Fox, even though there was a picketing charge, of all these substantive security fraud and mail fraud charges prior to his acquisition of the company on November 30th of 1993. So they acquitted him of all those. So the jury didn't believe he was involved in this. You know, at the time of the, for the Las Vegas seminar that was given a few months before he acquired the company, he was a sales associate. Unbeknownst to him, actually, he had sold 70% of the investments for the company. And what this shows is, and the jury's acquittal of him on those other charges, shows that, you know, he's the fall guy. He had no, this was the cross, this was certainly the cross Simons, Colello, you know, Beckner deal. This was their deal to defraud. When Cross came up with this, comes in, is selling, unbeknownst to him, is selling 70%, is generating 70% of the sales by the time of the Las Vegas seminar. And at the time, and then all sudden, the SEC starts this investigation. And Simons and Cross together come up with this cash-out scheme that I talk about in the opening brief. And they are the only two signatories to the Marquis account, which is this scheme that allows them to cash out their deal and lay this bag of trash on Mr. Fox. And when you, then you, then you say, well, you know, what did Mr. Fox, and as I pointed out in the opening brief, I mean, the government in their closing argument said, you know, even Steven, everyone gets a share of partner, a partnership split. But I took, I was at pains in the opening brief to show that he didn't get, Mr. Fox didn't get a partnership split. He didn't get a partner split. In fact, when they devised this cash-out scheme, the only three people that got the split were Cross, Simons, and Colello. And they each got an even split, $333,000, plus Cross got one, an additional 1.2, I believe it was, for the, for his sale of the company to Fox. So what you've got is Fox coming along. And then, but then I need the government to point out that, well, look at what he did. He bought boats. I mean, he defrauded. This is theft. I mean, he, after Fox gets, starts running the company, all he, all he essentially does is just continue the company, is what the million on his wife's cancer, you know, bills. He buys a yacht. He does all, I mean, he's in on this. But it's not, but if you look at, step back again, wait a second, what's missing here is that in all the money that Fox spent, he didn't give any to Colello, Simons, or, or Franklin, or Beckner, or all these other people. I mean, he didn't, there was no split. I mean, it was, there was just no split there. But the jury, I mean, to say he wasn't convicted on the early counts, he was convicted after he was running, the jury decided to split guilt that way. That's, that was what they could do. And I think you've got to show why he wasn't guilty of running a Ponzi scheme. Well, I think that, with all due respect, Your Honor, I think that what, what the Didn't he know it was a Ponzi scheme when he started operating it himself? Shortly, shortly after he acquired the, acquired the company, he found out that they were not factoring government receivables. Yeah. And that was a bogus business. Yeah. And he's, the evidence shows that he tried to change the business. But he, he kept on, he tried to change it, but he kept on and he paid off with what other people paid in, didn't he? Yeah. No, there's no question about that. He kept on, but he did try to change it to what's called this letters of credit, securing the investors with these letters of credit. Well, that was a, a letters of credit scheme was just a wild scheme. No, but the letter, well, the letters of credit scheme is what enabled Cross to inflate the, the book value to show Fox that they weren't stealing from the company when he bought it. I mean, there's just no evidence that Fox knew about this before he, before he bought the company. And this letters of credit is a big issue because Cross executed about 2.4 million or above in letters of credit to inflate the book value of the, of the company. So when Fox looks at this, it's, it looks like there's a lot of money coming in. There's a lot of credit. He, then Fox acquires the company. He finds out that it's, it's, it's that he finds out that there's an SEC investigation. I mean, why, and then really the proof is in the pudding here. In trying to transfer this to not to get factory governance receivables, but to a letters of credit, a legitimate letters of credit investment vehicle, there's two transactions Fox makes to purchase letters of credits. He makes two, $1.2 million transactions. He purchases on behalf of the company, he purchases $2.4 million in letters of credits in early 94. And he doesn't get any of this. He just hands the money over just to, to Colello and Simons to purchase the letters of credit. I mean, but he doesn't get a split. I mean, this is a guy that legitimately thinks that, you know, otherwise why not just keep the 2.4 for himself? He was the signatory, only signatory on the account at that point. I mean, it just doesn't make sense. He's not into this. He's not in the conspiracy. Well, did they continue to represent to investors that they were in the factory business? Yes. And that's why we have not attacked his underlying convictions for, for, for securities fraud and mail fraud. We've not attacked those other than on the, you know, the severance issue and the other, but we've not directly attacked those. And we've certainly not attacked those on civility evidence because of that. We've not attacked that, but it's another thing altogether to say that he had expired and that there was an agreement between he and these other people to, that there was this conspiratorial agreement. There's no direct evidence of the conspiratorial agreement and all the circumstantial evidence that I'm pointing to, the split of profits, that he didn't get any, the money he spends to pursue these letters of credit and gives all this money to Coelho after the fact, there's no showing that he's involved, that he knows there's this agreement. And all the evidence, and that, so there's a, there's a, there's no credible solid evidence to support his conviction for conspiracy because there's a lack of evidence to show there's an agreement. Before you exhaust your time, can I ask you, just out of curiosity, I noticed that Mr. Cross challenges his sentence. Yes. And raises Blakeley issues. Right. Did, did, in your opening brief, I didn't see a challenge to the sentence. There is, there is no. We, we did file, the U.S. Attorney's Office and I filed a stipulated motion for permission to brief Blakeley and it was turned down by this court without, without prejudice, depending on the two U.S. Supreme Court decisions that are. Oh, that's right. Okay. I just, all right. So you essentially raised the same Blakeley type issues as Mr. Cross. Yes. I mean, that definitely applies to him. I mean, it's. The same, same, same enhancements were applied and everything. Exactly. The same enhancements, the huge, you know, $17 million restitution. I don't know whether that, but yes, the same enhancements. He was sentenced under the Sentencing Guidelines. He's got 121 months over a 10 year sentence. And certainly if Blakeley applies, if it was Blake, you know, if the Supreme Court, yes, it applies to him. And he's, his sentence was greatly enhanced by facts, not. Without the enhancements, at what point would he have served? You know, I believe it's six months and he's been in for three years. So, and I know the, the, the, the. Well, each one of the individual counts had a specific amount of money. Is that correct? Alleged. Yeah. That's substantive case. But never found by the jury, of course. The jury never found, the verdicts read as guilty, guilty, guilty, guilty. Not, there was no finding on a sum. There was, the jury found there was just guilty, guilty. It was no, there weren't. Well, with respect to each individual, is there any other amount other than the amount that was alleged in the, in the indictment? Any other amount that. Yeah. That what. You know, sometimes, you know, in these law situations, you know, it's. Oh yes, there are. I mean, I believe there are. Yes. There are other amounts. I mean, he's, he was ultimately held under the, under the sentencing guidelines with basically the entire. No, no. I'm only speaking with respect to what was alleged in the indictment. No. And what was given to the jury. In other words, the jury was given the counts relating to the substantive counts, which alleged a specific amount with respect to particular individuals. Right. And I think the probation officer said that if he, at least with respect to Mr. Cross. Right. That if he totaled those all up, it was about $8 million. With, yes, I think you're right. And that's, that's substantially less than. Right. But then if you go, so your point is there had to be a specific finding of $8 million in addition to just guilty. Yes. Or each amount. Yes. Correct. Counsel, the severance argument seemed to me your best argument. That doesn't seem to be something that's particularly concerning you. It is concerning me. And the reason is that, no, it absolutely is. I had seven minutes and 40 seconds. I've, the, Mr. Fox pleaded with his counsel, it's on the record, to sever his case. It appears that other cases were severed. You know, the only one, there were like seven individuals involved in this. And he and Cross were the only ones that went to trial together. Simons and there were, you know, Colello and these other individuals were also pending, pending indictment. But his counsel never, never would file it. Never would file it. In fact, said, and it's in the actual record, said that she can, I believe consulted Cross's lawyer and he said there's no basis for it. But of course, his, he was so dire, his, he was brought in, he was such a minor player. I mean, he was not a player from the original, and he was prejudiced by the joinder. And that's why I raised it in the opening, on appeal, even though it's, I raised it via ineffective assistance of counsel. Because I think that there's no question that Judge Marshall would have severed his case had his, his lawyer brought the motion. And in fact, we have, we have Mr. Cross's counsel arguing against Fox and calling him a liar in front of the very jury that's, that convicts him of all this. And you know, Mr. Fox is in his 60s. He, it's not like he's got a huge record. What happened, if he's a guy that defrauds people, well, you know, maybe that's the same with Cross too. At some point you, but he got really tarnished with all this evidence that, about the Cross, Colello, Simons fraud. Because it's those three individuals that started this thing in 1993 when Fox was a sales associate and didn't know that he was, he was, Fox was selling this to his family. In what ways were the defenses of Cross and Fox diametrically opposed to one another? Well, they, Cross relied on the argument that, that at least within the last two weeks, at the time they sold the company to him, that, that Fox must have known what was going on. Actually, they never even, they never even spoke, but he didn't argue that, that they must have known what was going on. And then Fox's... Well, how would that contribute to Cross's defense? Well, Fox could have used Cross, in his case, to support his defense that he did not know that this was an illegitimate company at the time he purchased it on November 30th. Well, in fact, the jury kind of helped him along on that. They acquitted him of everything before the sale. Right. But they, but then he just got, they found him guilty of the conspiracies when there's just no evidence of it. I mean, if you, if you look at the circumstantial evidence at all points that he was not part of this conspiracy, that he, he wasn't giving partners splits after he acquired the company. He wasn't making partner splits of profits. He was buying boats and stuff all for himself. I mean, all these things he did with the money, which was crazy what he did. He wasn't enriching his so-called partner. So there was no partnership there. There was no conspiratorial agreement. So his defense was opposed to the defense that Cross presented. I mean, Cross presented this defense of, this is legitimate. And this is just ludicrous, presenting that kind of defense in light of the evidence that the government presented. I mean, there's just no basis to say that with a straight face to the jury. And Fox was wrapped up in, you know, sitting right there at counsel table with Cross. Do you think the record's adequate enough to reach the ineffective assistance in counsel claim? I think it is. On direct appeal rather than in a 20 to 55? Usual practices, the usual practice in the Ninth Circuit, you know, you read all the cases, it's generally, you know, comments about, you know, it's preferred that these be heard in a 20 to 55. I understand that. But I would certainly not suggest to the Court that the record could not be more fully developed. I think it could. I think it is sufficient, though. The judge had a colloquy with Ms. Berry at some point along the way about Mr. Cross being upset with her, but she hadn't made this motion to separate. It would suggest that there were other reasons at play for her decision not to. Yeah, I mean, I can't speculate on that other than I know what's on the record is that what's on the record is that, and what she told the judge, Marshall, is that she consulted with Cross's lawyer, and Cross's lawyer, who was a former USA, AUSA, said, there's no basis to do this. And I think that, personally, it was easier for her to try the case with a very good co-defendant's counsel. I have one last question for you, and that's with respect to the, you know, when they had the discussion about the exhibits. Right. And the whole question of Mr. Fox not being present at the time and the written waiver that was signed. Right. That's, and what, what, what you've got there is you've got Mr. Fox signing a written waiver before this 30-day trial begins. Well, long before. Long, long before. Early on. It's incredible that the U.S. attorneys could come in and argue that this is a knowing waiver of rights to be present during the presentation of evidence. Because this purported waiver that was being used by the U.S. Attorney's Office is incredible. It's waiving the right to be present during the trial, period. And it's made way before the defendant could reasonably anticipate what's going to happen. And whether his appearance would be, you know, would reasonably aid the proceedings. So it seems to me that they don't win on the written waiver for that reason. It's, it's not at the time, when the time comes for the district court to actually admit, and this is incredible. I've never seen a case like this where the district court actually admits evidence outside the jury's presence without the defendant present. So it's a trial proceeding without the jury there, and then sends it back to the jury room. I mean, this is conducting a trial without the jury in court. That is actually what happened. So it is problematic. And I think that that causes the, causes this court to, should cause this court to reverse the money laundering challenge. Because that's what it went to. This was a substantive evidence. And the fact that it was, quote, admissible, you know, the attorneys, you know, this stuff was admissible, but they didn't admit it. And they didn't reopen. And it was, it was taken outside, it was accepted and taken outside of the jury's presence, too. I think I'll reserve the rest of my time, the remainder of my time there, if that pleases the Court. May it please the Court? Yes. Mr. Crawford on behalf of Mr. Cross. Your Honors, I believe the primary argument that needs to be addressed to the Court is the sentencing issue concerning the applicability of Apprendi and Blakely to Mr. Cross's sentence. As the Court's well aware, Apprendi held in 2001, any fact other than the fact of a prior conviction has to be alleged in the indictment and proven to a jury beyond a reasonable doubt. Blakely expanded upon Apprendi substantially, basically stating that the facts that are found by the jury are those facts which basically will limit the sentence which could be imposed by a district court. Tell us exactly what facts the judge relied on that were not decided by the jury. Yes, Your Honor. Originally, as to the, there's two basically group counts. There's the fraud counts and then there's also the money laundering counts. As to the fraud counts, the base offense level would be six, resulting in a zero, and with a criminal history of one, it would be a zero to six month sentence. And increasing the sentence, there was a 14 level increase pursuant to USSG 2F1.1BC1C because the law succeeded $5 million and was less than $10 million. There was a two level increase because of a finding by the district court that there was more than minimal planning. There was a two level increase, excuse me, a four level increase for the role in the offense of being a leader or organizer. There was a two level increase for abuse of a position of trust. And there was a two level increase for obstruction of justice. That comes up with an adjusted offense level of 30. So an increase from a base offense level of six to a base offense level of 30. I already got a red light. Wow. No, keep going. We let him go. I let him go a little bit too long. Okay. Actually, it was only 20 minutes per side, but I should have cut him off a little bit. Okay. But we have a base offense level increase from six to 30 based upon facts that were not submitted to the jury and were not found by the jury. As part of my excerpts of the record, I have attached the jury verdict that says guilty, guilty, guilty, not guilty, not guilty. That's basically how it rates. There was, as to the court's question earlier, I think what the court needs to also determine, it asks whether or not the finding is that the amount was parcel of that. Right. Because the indictment alleges a specific amount of money on the substantive accounts. It does, Your Honor. On the substantive accounts. And presumably when the, I would think when the jury returned its verdict, it was on that amount. Your Honor. It wasn't just a range in there. It was a specific amount. There were specific amounts alleged, but if the court looks at the testimony by the witnesses, number one, there was no finding by the jury as to the amount. Number two, the amount is not relevant. It's not an element of the offense as of yet. Mail fraud would require the use of the mails for purposes of committing a fraudulent enterprise. But it doesn't, it could be for a dollar. It could be for $8. It doesn't have to be for a million. And if we look like, I'm just going to, because I just opened my brief to page 18. By count two, we have Mr. Alvin Bushman. There's apparently a $1,100,000 investment, but there's $150,000 on one day. There's $100,000 on another day. I mean, the jury would have needed to basically find this and tally it up in order to make a finding beyond a reasonable doubt as to the amount of loss. I mean, maybe he was mistaken. Maybe the jury thought he was partially. I mean, that's all requiring speculation and guessing, essentially, as to what the jury did find and did not find. Well, I guess these cases are going to be rather difficult for us when we finally get a decision from the Supreme Court. But it seems to me what we have to look at is, okay, what was charged in the indictment? And if the jury found the guilty on the particular count that said, let's say, $2 million, then we look at the evidence to see whether there was evidence in the record. Which would have supported that. And if there was, then, okay, he's stuck. But if, in fact, there was no evidence put on as to the $2 million, then I guess we have a problem. But I think if we look at the Ninth Circuit model jury instructions, and I don't have them ahead of me, but basically there is no amount of loss. In order to find the defendant guilty of that offense, the amount of loss was never determined or found by the jury. In order to find him guilty, the jury would never have had to make a determination as to the amount of loss suffered by the victim in order to convict. And so, therefore, the amount of loss was not a necessary prerequisite to the jury determination of guilt. Since it was not a necessary element of the offense, it was not necessarily had to have been found by the jury. I mean, a jury could have found Mr. Bushman, and I don't mean to pick on Mr. Bushman, it's just my brief has opened us to this page. Mr. Bushman could have, they found the $100,000. Maybe they thought he was mistaken as the $150,000, or maybe they didn't think he was certain enough. I mean, all that has to be found by a jury beyond a reasonable doubt, and I think that's where the problem lies. Because there was no finding as to the amount of loss by the jury, nor did the jury have to make a finding as to the amount of loss in order to return a verdict of guilty. Even though the count says he defrauded X to the extent of $2 million. Yes, but in order to return a verdict of guilty, the finding was not contained in the verdict. And since the finding was not contained in the verdict, we don't know if the jury found that amount true, and how much did they find that they've lost. And a lot of the victims, as I indicated, the amounts of losses, they were not one-time investments. There were multiple investments over a period of time. $10,000 here, $100,000 there, $50,000 there, is essentially the way it went. And the jury would have had to make a determination and basically tally up the amounts of each of those losses by the victim in order to find the amount of loss beyond a reasonable doubt. The other thing is, I just wanted to bring to the courts, the AUSA is aware of this, and U.S. v. Castro, I think, is one of the decisions. I didn't cite it, I didn't write a letter, but I think everybody's familiar with the decision. You know, obviously under Ameline, there's plain error, there's error, it's plain. It affected Mr. Cross's substantial rights as he's looking at a sentence in the range of zero to six months based upon the findings by the jury. And based upon Castro, I understand under the court in a lot of these cases, they're deferring ruling, deferring judgment until the U.S. Supreme Court decides Booker and Fanfan. However, in this particular case, the question is, what is Mr. Cross looking at based upon the jury's verdict? It's our position he's looking at a sentence. Based on the first set of group counts, he's looking at a sentence of zero to six months. On the second set of group counts, the money laundering counts, the base offense level would have been 23. The 23 base offense levels then increased six additional points based upon the finding of loss between 2 million and 5 million dollars. I don't have the site, but it's in the PSR. And based upon that, he has adjusted offense level on the group counts of 29, and adjusted offense level, I believe, of 30. You take the greater of two, and you have the two grouped 30 plus two, and I think that's essentially how it worked out. But if we, let's say we put aside the zero to six month argument with regard to the fraud counts, what are we going to do with the money laundering counts? Then you have 29, but the 2 million to 5 million dollar loss was not found by the jury. It was not submitted to the jury. So there's no determination as to loss. So then you have a base offense level of 23. With a base offense level of 23, Mr. Cross would be looking at a sentence in the range of 46 to 57 months. He's served approximately three years of the sentence. In the event, we don't know when the argument's going to be had by the Supreme Court. They already had argument. Did they have it? We're just waiting for the opinion. Okay. But if it's going to be, you know, hopefully it'll be any day. If it is any day, that'd be great. But I mean, if it's going to go on for six to 12 months, Mr. Cross could be ready for a halfway house in the very near future. So either way, I think the error is significant, and I believe that under Amelie, the immediate remand would be the appropriate step. Thank you. Thank you. Government. Good afternoon, Your Honors. May it please the Court. Jeffrey Isaacs on behalf of the United States with me as Pamela Johnston. I'm going to address the issues raised by Mr. Fox, and Ms. Johnston will address the issues raised by Mr. Cross, including those having to do with Ameline and Castro. So I'll jump right into the sufficiency argument. What you have, Your Honor, is a conspiracy, two conspiracies that were begun under the leadership of Mr. Cross and then continued and really reached new heights under Mr. Fox. What happened here is that in November of 1993, when Mr. Cross sold the company, Cross Financial Services, to Mr. Fox, Mr. Fox essentially stepped into the shoes of Mr. Cross. And I believe that's exactly what the jury verdict reflects. And as counsel for Mr. Fox indicated, there really is no dispute that Mr. Fox, soon after acquiring the company, came to know that the company was not engaged in factoring, was not providing the insurance that it had promised, that it was a Ponzi scheme, and that it was buying these worthless letters of credit. And in fact, Mr. Lathrop says that there was no explicit agreement. But in fact, this is one of those few cases where there actually was a written agreement. And that was the agreement selling Cross Financial Services to Mr. Fox, because that agreement itself contemplated that the purchase price, which came out to about $1.6 million, was not going to be paid by Mr. Fox. It was going to be paid using misappropriated investor funds. And that's exactly what happened. So right from the start, you have Mr. Fox knowingly participating in a fraud. And then going forward, on a forward basis, he knowingly participated in every aspect of that fraud, which included false representations and promises to the investors, the misapplication of investor funds. Mr. Fox far exceeded Mr. Cross, both in the amount of money that he raised from investors under false names, under false representations, and the amount of investor funds that he misappropriated and spent for his personal uses. Somewhere around $5 million. He also used investor funds, misappropriated investor funds, to purchase these worthless letters of credit, gauged in lulling conduct, similar to that of Mr. Cross, and concealed material facts from the investors, and then later from the SEC, the receiver that was appointed by the court, and also the district court that presided over the SEC civil action. So you have a situation where there's just a change in leadership, but the conspiracy, the essential nature of it, remains the same. And in fact, if I could refer the court to two portions of the government's excerpt of record, which I think really drive home that point. The first is the government excerpt of record at 589 and 590, Your Honors. And that's the lender agreement and promissory note. This was, there were hundreds of these, both under Mr. Cross and Mr. Fox. These are examples, they were government's exhibits. These are examples of the lender agreement and promissory note issued under Mr. Fox's tenure. And in fact, these are signed by Mr. Fox, dated March 14th of 1994, relate to one of the count victims. And in the lender agreement, it provides essentially the same thing, that exact duplicate of the agreement used by Mr. Cross when he headed the company, except that Mr. Fox has snuck in a reference to something referred to as bank guarantees as part of the protection of the lender funds. And then the promissory note, which is government's excerpt of record at 590, is the exact same document that was used by Mr. Cross when he ran the company. The other interesting reference, I think, Your Honor, is government's excerpt of record at 756. And this is a defense exhibit, and it's one of these secret side letters having to do with the worthless letters of credit. Mr. Cross signed them, and then when Mr. Fox took over, he signed them as well. And what these letters of credit provided was that essentially, in order to draw on the letter of credit, and the one that's at 756 is a secret side agreement relating to a $2 million letter of credit to be issued in the name of Cross Financial Services. In order to draw on the letter of credit, the beneficiary, in this case Cross Financial Services, would have to deposit the face amount, $2 million, with the applicant. So you couldn't get your money unless you gave the applicant the money so that he could give it back to you. So every aspect of this conspiracy that was begun under Mr. Cross continued under Mr. Fox. Let me move then, if I could, to Judge Fletcher's concerns regarding the severance issue. And first, I think that this is not an issue that's ripe for decision on appeal, that there would be matters, material matters, that could be developed back in the district court. But what would those be? Well, I think that there may have been a strategic reason for Ms. Berry not seeking the severance of her case, or from Mr. Fox's case, from Mr. Cross. The antagonism, to the extent there was any, and it's really not clear what that was and what the nature of it was and what the extent of it was, but to the extent there was any antagonism, it really didn't even develop until the cross-examination of Mr. Fox and Mr. Cross. And it's only then that they began really pointing the fingers at each other. Through the government's case in chief, or even before that, starting with the opening statements, through the government's case in chief, and then beginning into the defense case, it seemed like a coordinated defense effort where both Mr. Cross and Mr. Fox were trying to point the finger at their co-conspirators, Beckner, Siemens, Colello, and others. It was only during the cross-examination that Mr. Fox started pointing the finger at Mr. Cross and vice versa as to the sale of the company and then what Mr. Cross provided to Mr. Fox in the way of valuable assets and the like. And then it really became, if there was a conflict, it became one during the closing arguments of Mr. Cross and Mr. Fox. But when Mr. Cross' counsel called Mr. Fox, in effect, a liar, that begins to be pretty bad. That's correct, Your Honor, but again, that was only during the closing. That you really start, and it's only during that cross-examination that you first begin to see the antagonism developing. So I think that there's, it's very likely, and I think that if you examine the record, as I'm sure this Court already has or will, from beginning to end, you see that there was a coordinated effort at first. And there may very well have been a strategic reason for not seeking a severance. I also don't think that they would have succeeded in getting the severance. Mr. Fox never wanted a coordinated effort. He made it very clear from well before trial. That is correct, Your Honor. Mr. Fox did say that he wanted the severance and his counsel indicated that she did not believe that there was grounds for one or that it was in his best interest. And I don't believe that a severance motion would have succeeded. Mr. Cross, Mr. Fox, and Mr. Siemens were all set to go to trial together when Mr. Siemens pled guilty. I believe it was the day before the day. Actually, I think it was the day of jury selection. Colella was severed out because first, his conduct was related to the letter of credit scheme principally. And second, there were issues with his counsel. He changed counsel about half a dozen times. So it wasn't so much that there was a basis for a severance under the law as it was required as a practical matter. That's troubling because Fox didn't want his counsel either. Well, nobody wanted their counsel. All their counsel was appointed. And nobody wanted their new counsel when they got it. And I think the record shows that both Mr. Callahan and Ms. Berry did an exceptional job on behalf of both their clients. I think the evidence was there was substantial evidence, if not overwhelming, and they both procured acquittals and they fought everything, including Ms. Berry keeping out. And I believe this is part of the record. Probably the most damaging evidence against Mr. Fox was that he lied about his military record. He said he was a POW and that he had been held in a prison camp and he had been, I believe, a captain in the Marines. And in fact, I believe he had been dishonorably discharged from the military. And Ms. Berry fought because we fought with her every step of the way. Governments case in chief, defense case in chief, rebuttal case, and she was successful in keeping that out. So I think they both got extremely effective assistance of counsel, as the record supports. One last thing before I turn it over to Ms. Johnson, and that's the waiver issue. The written waiver here was a standard waiver form that is used by the district court. It's not something that the- I've never seen that before. I'm surprised. Apparently, I think it's the standard form in the Central District of California. It was- Here's somebody who came from the Central District. I know. I've never seen that before. We don't give them out. We don't have them. We didn't ask for it. I think it's done on a fairly routine basis in lengthy cases like this. And that was something that Mr. Fox executed along with Ms. Berry, and we were not involved in that process. But even if you put aside that written waiver, right before, right during the deliberations, or once deliberations began, Judge Marshall took a full and complete waiver from both Mr. Fox and Mr. Cross as to their presence at the conference to settle jury instructions and exhibits. And basically- But then what happened later was- I don't think that was related to jury instructions. Well, in a way it was, Your Honor. I think our position is if you look at it, it's basically the same type of thing, where you have exhibits that were deemed admissible, that were- their evidence record status, their admissibility or their relevance, but they weren't received by the district court during the trial or the presentation of evidence. And oftentimes during conferences to settle exhibits, as the court knows, the parties will ask the court to receive into evidence exhibits. And that's essentially what happened here. But at the beginning of the conference, on the May 18th conference, Ms. Berry advised Judge Marshall that Mr. Fox was not present pursuant to his waiver. So the test here being, did he voluntarily absent himself? I think the government's point is simply that everything in the record indicates that Mr. Fox had no interest in being at that May 18th conference, certainly had every opportunity to, and appears from the record that he was even present in the courthouse. There was a break of a half hour as the parties attempted to work on the language of the supplemental instruction. And still Mr. Fox did not appear. So you had every- Does the record reflect that he was in the courthouse that day? Well, the record reflects at an earlier conference, Ms. Berry saying that Mr. Fox was going to remain in the courthouse. And Judge Marshall saying, fine, then I'll make you responsible to make sure that he's present if necessary or if he wants to be. So as far as the record indicates, and we don't have anything for sure as of May 18th, but the record would suggest that he was present each day of the deliberations in the courthouse pursuant to the representation that Ms. Berry made to Judge Marshall. And then the last thing also about the severance, Judge Marshall, very careful judge, there's no doubt that if she thought that a severance was appropriate, she would have A, either granted it sua sponte or B, granted it pursuant to a motion and without hesitation as to whether this would have taken more time or not. I think she's shown in the past that that is not going to be something that would preclude her or even in any way prevent her from making sure that these defendants had a fair trial. Mr. Isaac, I wanted to ask you, do you have some comment on why Fox didn't share on the profits and the letters of credit after he was running the business? Because I think, Your Honor, the evidence suggests that his concern was not or his goal with these letters of credit was not to obtain a piece of the action, but to have something, a piece of paper that he could show either investors or the SEC as backing up these investments. And that's why he changed these agreements, the lender agreement and the promissory note, to sneak in that language about a reference to a bank guarantee. And then in the SEC action, that's exactly what he told the SEC during his deposition. Well, this was fully supported by these bank guarantees. And the bank guarantees were really, as Mr. Romano testified, these were a fraudulent credit enhancement vehicle. So did anybody make money out of them? Well, nobody made legitimate money on them, but certainly Cross, Siemens, Bechner, Colello, Romano and their crowd got quite a bit of money out of it, several million dollars. I guess the question was why didn't Fox help himself to some of that? That I can't tell you, Your Honor, other than the fact that he helped himself to plenty of the investor money. This company was a cash cow, maybe an illegal cash cow, but he helped himself to almost $5 million in investor funds to buy a boat, more in the range of a yacht, I guess, at $350,000, an airplane, fund his son's skateboard shop, etc., etc. So he was making plenty of money from the underlying scheme. I think his concern was to have some basis to claim that there was protection to these investors and that it wasn't just a Ponzi scheme. Thank you, Your Honors. Good afternoon, Your Honors. Pamela Johnston for the United States. I'm going to go ahead and just start with the sentencing issue. Not all of this was fully laid out in the supplemental briefs that we filed. I think it was in a cursory form. There's been some additional case law this Court has issued, Castro being the main one. Why don't I start with money laundering because I think that's the easier place to start. Obviously, the base offense here for the money laundering conspiracy and the substantive counts of money laundering for Mr. Cross, that would be counts 26, 27, I believe 29 and 30. The base offense is 23. Necessary to the finding of the jury was the finding that there was more than $2 million. To answer Your Honor's question, it was actually alleged in the indictment the amount of money that was set forth in the money laundering conspiracy, I think it was more than $5 million. So the defendant certainly knew they were going to be defending against a case where the amount of money laundering was quite substantial here. The particular crime of money laundering that is alleged in this case and was proven to the jury was international money laundering. It's a little bit of a different variety. The Court may not see it a lot. It's the crime is when the money crosses the U.S. border. So when those monies were sent from the United States to Switzerland, that's the crime. Necessary in the finding of the jury is the following. The timeframe, using count 27 as an example for Mr. Cross, count 27 says the timeframe was August 20th, 1993 through September 3rd, 1993. It describes for venue purposes that the money starts in the central district. And it says transfer of $12,500 from victim Gene Horn's account at California Federal Bank in Westlake Village to Finchner Bank in Zurich, Switzerland, via Bank One in Phoenix, Arizona. The substantive counts obviously incorporate the language from the conspiracy. The conspiracy count that is part and parcel of this transaction is alleged in paragraph 46. Paragraph 46 talks about the fact that the transfer to Switzerland was a wire transfer. That's a single unit, and it's $266,606. So necessary to the jury's finding of when the defendant was found guilty of both the conspiracy and the substantive count there is that this $200-and-some-thousand transfer from the United States to Switzerland. The same thing applies to each of the three substantive counts. Count 29 is the one that has to do with the $27,000 that starts in the district. But the transfer that actually goes to Switzerland is set out in paragraph 51. That's $360,000 that's wire transferred from the United States to Switzerland. Lastly, count 30. In count 30, it describes the $100,000 that Hollis Schindler gives. That money gets transferred to Switzerland as part and parcel of a $1,760,000 wire transfer. When you add all those amounts up, you get $2,386,606. In other words, it's more than $2 million. That's the six-level enhancement that the judge applied. So here, this happens to be a case where the facts can be affirmed based on the jury's findings. It would not be necessary to remand for that for the defendant to stay in custody. It would be, I think, advisable under Castro to wait for Booker Fanfan and just wait to see what the rules are, what we're going to all be dealing with. I will advise the Court that Mr. Cross went into custody a little bit earlier than Mr. Foxx. He was in custody May 18, 2001, so he's been in approximately 42 months. If the Court follows the suggestion of Mr. Foxx. How long has Mr. Foxx been in? He went in custody at the time of sentencing, so about six months later. He went in December 2001. He had been – it's a little more complicated, though, because he had been in custody for a while previously and then let out, so there's not exactly sure how much time he did before the time he got to sentencing. I mean, he was in MDC for a while. He was in MDC and then got out on bail and then was out on bail during the trial. If the Court follows the government's suggestion here, that would mean the offense level at least of 29. Offense level 29 is 87 to 108 months, so clearly we would have a good amount of time until the issue would even begin to appear and be necessary like it would be in Castro. With regard to the issue of the other allegations, I will point out, as we did in our brief, that there's a bunch of things that were not objected to. Nobody thought they were disputed, and it seems as though the thrust of Blakely is really that if things are in dispute, they need to go to the jury. We have a whole bunch of things here that were not in dispute, that were not objected to before Judge Marshall. The examples of that would include the loss amounts. The loss amounts were not disputed at the time of sentencing. In fact, Mr. Cross admitted during cross-examination that one of the charts that said that was $3 million raised in November of 93, that seemed accurate. On the tape that the court has had access to, he admits that up to the time of the seminar, $4 million had come in. If you add those two amounts together, you have $7 million. The court held him responsible for about $8 million. So there's nothing here that really would make a difference. It would be unfair, I think, to the government if the court were to open up the entire I think we just need to really wait to see what the Supreme Court does with Booker and Fanfan. I would just make the point that this is one where, because of those money-laundering findings, it's a necessary finding for those levels up. So it's one that can actually wait until the Supreme Court has decided, the Booker and Fanfan. Thank you. Can I just make one quick observation? One, and that's it. Your Honor, the U.S. Supreme Court has noted one of the reasons why the general rule is that the cases should be stayed until Booker and Fanfan have made a decision. However, in the case where the defendant is looking at a relatively short sentence, the district court is best suited to make a determination on bail. And I believe based upon that, that's why we should do an immediate remand under Ameline rather than stay it. Thank you. Thank you. You have five, 30 seconds or 22 seconds. Judge Marshall made it clear she wasn't going to rule on a severance motion sui sponte. I mean, that was just very clear by what's outlined in the opening statement. Yeah, that was very clear. And it's been denied. The basis for the severance motion would have been that he was denied his – would be denied his fair trial right, his due process right to appeal. But in the fair trial, when he is sitting at counsel table with Cross, with Cross just lying to the jury, with Cross presenting a defense of, I didn't know what was going on, when you just can't present that with the level of evidence the government had against him. And when you've got a situation like we do here with Cross, where Fox clearly, by the jury's verdict, did not know what was going on until he bought that company. You've got a situation where you have a very innocent – a relatively innocent man sitting next to a very guilty man. And you've got a situation where the jury can't reasonably make then a decision whether he's going to be – whether he's going to receive a fair trial, whether – and I think we see that in the conspiracy, because you just don't have the evidence of the conspiratorial agreement. Yet the jury finds it. Convicts him on that. Thank you. The matter will be deemed submitted. Thank you. And we'll be in recess until tomorrow. All rise.
judges: B. Fletcher, Noonan, Paez